**Pages 1 – 43**

                       **UNITED STATES DISTRICT COURT**

                      **NORTHERN DISTRICT OF CALIFORNIA**

               **BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE**

COPYTELE, INC.,                      )
                                     )
            Plaintiff,               )
                                     )
  VS.                                ) NO. C 13–378 EMC
                                     )
E INK HOLDINGS, INC., et al.,        )
                                     )
            Defendants.              )
                                     )
_____)


COPYTELE, INC.,                      )
                                     )
            Plaintiff,               )
                                     )
  VS.                                ) NO. C 13–380 EMC
                                     )
AU OPTRONICS CORPORATION, et al.,    )
                                     )  San Francisco, California
            Defendants.              )  Thursday
                                     )  June 27, 2013
_____) 1:42 p.m.



                    **TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                        275 Battery Street
                        29th Floor
                        San Francisco, California  94111–3339
                    BY: ERIC B. FASTIFF, ESQ.
                        DAVID T. RUDOLPH, ESQ.

(Appearances continued, next page)

APPEARANCES, CONTINUED:


For Defendants E Ink Holdings, Inc. and E Ink Corporation:
                        WOLF, GREENFIELD & SACKS, P.C.
                        600 Atlantic Avenue
                        Boston, Massachusetts  02210-2206
                   BY:  MICHAEL N. RADER, ESQ.
                        GERALD B. HRYCYSZYN, ESQ.
                        and
                        CROWELL & MORING, LLP
                        1001 Pennsylvania Avenue, NW
                        Washington, DC  20004-2595
                   BY:  DAVID J. LAING, ESQ.
                        and
                        CROWELL & MORING, LLP
                        275 Battery Street
                        23rd Floor
                        San Francisco, California  94111
                   BY:  BEATRICE B. NGUYEN, ESQ.



For Defendant AU Optronics Corporation:
                        LATHAM & WATKINS, LLP
                        140 Scott Drive
                        Menlo Park, California  94025
                   BY:  MATTHEW RAWLINSON, ESQ.




Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court

**THURSDAY, JUNE 27, 2013**                                          **1:42 P.M.**

**P R O C E E D I N G S**

**THE CLERK:**  Calling Case C-13-0378, Copytele versus E Ink, and also C-13-0380, Copytele versus AU.

Counsel, please come to the podium and state your name for the Record.

Please come to the podium and state your name for the Record.

**MR. FASTIFF:**  Eric Fastiff, from Lieff Cabraser Heimann & Bernstein, on behalf of the Plaintiff.  With me is my colleague, David Rudolph, also from Lieff Cabraser.

**THE COURT:**  Great.

**MR. FASTIFF:**  Good afternoon, Your Honor.

**THE COURT:**  Good afternoon, Mr. Fastiff.

**MR. RAWLINSON:**  Matt Rawlinson Of Latham & Watkins on behalf of AUO.

**THE COURT:**  All right, thank you.

**MR. RADER:**  Your Honor, I'm Mike Rader from Wolf, Greenfield & Sacks, on behalf of E Ink, in the 378 patent case.

**THE COURT:**  All right, thank you.

**MS. NGUYEN:**  Good afternoon, Your Honor.  Beatrice Nguyen from Crowell & Moring morning on behalf of E Ink, both in the 378 case and the 380 case.

**THE COURT:**  Great, thank you.

**MR. HRYCYSZYN:**  Good afternoon, Your Honor.  Jerry

Hrycyszyn with Wolf, Greenfield & Sacks on behalf of E Ink in the 378 case.

**THE COURT:**  All right.

**MR. LAING:**  Good afternoon, Your Honor.  David Laing, L-A-I-N-G, with E Ink on the 380 case.

**THE COURT:**  Okay.  All right.  Thank you, everyone.

So, I understand that a stipulation has been reached with respect to arbitration as to AU Optronics.

**MR. FASTIFF:**  That's correct, Your Honor.

**THE COURT:**  And so, that motion is no longer at issue.

**MR. FASTIFF:**  Correct.

**THE COURT:**  Okay.  So let me first address the 378 case, in the patent case, the motion to dismiss for lack of standing.

Seems to me the critical question is whether or not there's been an assignment of sufficient substance and scope so as to essentially divest Copytele of the ability to bring suit. Because if there was, even though there's a pendency, I understand there's a dispute as to whether or not the EDP -- EPD agreement is valid, and whether or not rights might revert depending on the outcome of the arbitration back to Copytele, as we stand here now, that hasn't happened.

And so, the critical question is what's been assigned, or whether this is more of a -- I don't know if you call it a

license or something less, such that Copytele would retain the right to have standing.

And, in that regard, besides the intent of the parties which has -- which, if you looked at the agreement, has some very broad language about full exclusive rights and all substantial rights, et cetera, the critical question is sort of, at least as the Federal Circuit has laid out, of a number of factors, but the most important of which is the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor as the, quote, most important question.  And that has come up several times.  And time and again, that seems to be fairly important.

And when I look at the terms of the settlement agreement, it does say it is the intent and agreement of the parties that the -- that it transfers to AU the full exclusive rights and all substantial rights in the licensing patents, such that licensee shall be able to bring an enforcement proceeding in its own name, and that no rights have been maintained by Copytele that would require Copytele to be named as a party in any enforcement proceeding.

In looking at the agreement, I don't see any retention of rights.  It looks like a full assignment of rights of enforcement vis-a-vis third parties.

So, let me first ask, am I missing some provision -- I

know there are other arguments about limitations on the assignment, payment of maintenance fees.  But this is the most important factor.

So, is there anything here that suggests that AU has less than full rights, enforcement rights, and that there's been some retention of rights by Copytele in the enforcement arena?

**MR. RUDOLPH:**  No.  The -- the agreement provides AUO with the full exclusive right to sue.  However, as we've argued, Copytele actually maintained, we think, four of the nine rights that the courts have looked to as being substantial rights that determine standing to sue.

And we also argue that even if the agreement did effectuate a transfer of the right to sue, that it's been terminated as of -- prior to filing of the case.

**THE COURT:**  All right.  Well, I know that some of the indicia -- the obligation to pay maintenance fees, which is one factor, although that could be construed as a benefit not necessarily for its own self but part of the obligations owed to AU, but I admit that that's one factor.

The right to use the patent is retained, but only in a non-competitive manner, so there are some restrictions on what Copytele can do.  It's not an unfettered right to use.

And I understand there is a right to assign that's been -- that's restricted.  That is, that AU does not have complete right to assign.  It is subject to consent of Copytele, which

is -- of all the factors, that seems to me to be probably more significant than the others, because that is a fairly substantial restriction.

But, some of the cases that give great weight to that are situations where there's been retained an arbitrary right to refuse, almost unfettered ability to refuse to consent to any assignment.

And here, I didn't see any agreement, language that talks about sort of unencumbered, unlimited, unfettered right to veto any assignment.  And, unless there's something in here that I, again, missed --

**MR. RUDOLPH:**  There's nothing in the agreement limiting the grounds on which Copytele can veto an assignment.  It's completely at its discretion, for any reason, or no reason.  There's nothing in the agreement that limits the reasons why it could veto a transfer.

**THE COURT:**  Does it say -- what provision is the transfer?  What section is that in?  6.3?

**MR. RUDOLPH:**  That's correct.  6.3.

**THE COURT:**  All right.  Is there some reason why the normal duty of good faith and fair dealing isn't implied to a provision such as this, absent an exclusion of that obligation?

**MR. RUDOLPH:**  The duty of good faith and fair dealing would still apply to this.  However, we think that this limitation, along with the other substantial rights that

Copytele has retained, illustrate that the -- the parties -- Copytele actually intended to retain substantial rights and retained ownership of the patent.

And, the agreement is actually susceptible to the interpretation that what the parties were trying to do is essentially contract out the right to sue to AUO, while retaining substantial rights for Copytele, which, as the Federal Circuit, Supreme Court authority going back since the twenties, has held parties cannot do.

**THE COURT:** Well, but there are other rights -- it's not just the most important factor, quote-unquote, about the right to enforce. But, you know, they did get an exclusive worldwide license. And, and can't sublicense without apparently -- I don't recall if there's a restriction. That's a pretty big substantive right, seems to me.

And, so, I don't see any -- you know, that's not a minor right involved. It's not just the right to sue. There are some real economic rights that were conferred by this.

Granted, there's supposed to be some payment and some consideration going back the other way, which is kind of your last argument, but this doesn't seem like sort of an empty, you know, assignment or purported assignment. Seemed like a substantive one.

**MR. RUDOLPH:** A couple of points. First, with respect to Copytele's right to use the patented technology, it

is not the case that, as E Ink argued, that Copytele can only use it for basically research activities related to the agreement.  The agreement states that Copytele can use it in a noncompetitive manner consistent with that agreement.

That doesn't place any limitations on Copytele's ability to build and market products that would not be competitive with the products that were contemplated under the joint development agreement.  There's nothing, absolutely nothing in the agreement that limits Copytele's ability to develop, market ants sell products that would not be competitive with the products that the parties intended to develop under that agreement.

THE COURT:  What does it mean, "in a noncompetitive manner"?

MR. RUDOLPH:  Consistent with this agreement.  I think that agreement -- that -- that clause requires that Copytele couldn't, for example, build its own EPD screens that it intended to sell alongside with whatever else AUO was planning on selling.

THE COURT:  Yeah?  Well, that's a pretty big restriction, isn't it?

MR. RUDOLPH:  That is, but there's many uses for EPD displays, other than in e-readers.  They're used in signage, they're used in watches, they're used in other applications.

It's not a complete restriction on Copytele's ability to

monetize its rights in the patent.

THE COURT: But it's quite different from just a regular license where you just license another party, a licensee to use the technology without any restriction, of course, on the licensor's ability.

Here, there is some restriction taken on. So, something given away. Maybe not the whole bundle of property rights, but certainly some major sticks.

MR. RUDOLPH: Right. And I -- I think that's the key point, is that it -- Copytele did provide some of the substantial rights to -- to AUO. It didn't provide all the substantial rights.

And unless all substantial rights were transferred, the agreement, despite what the intent of the parties might have been, didn't actually effectuate a transfer of the right to sue to AUO.

THE COURT: All right. What's your response to that, Counsel?

MR. RADER: With respect to the issue of -- of the retained right to use the technology in a noncompetitive manner, I'm not sure I understand Counsel's argument.

The -- the agreement -- the scope of the license that was granted to AUO under the agreement covers the licensed products which are broadly defined, and would not, Your Honor, exclude things like watches. It would not exclude signage. Those are

all products, under the scope of the definitions and the schedules provided in the agreement, that AUO is licensed under these patents to produce.

So it's very clear, when the agreement says that Copytele retains the right to practice in a noncompetitive manner, that it cannot sell products that compete with AUO in any field using the EPD technology.

Brings it within the scope of the cases we cited in our brief, Your Honor.  There are multiple cases in which parties retained some sort of a noncommercial or noncompetitive right to use the technology, and that was not considered to derogate from the exclusive license that was granted to a party that the Court ultimately found had received an assignment by virtue of all substantial rights.

THE COURT:  So what's the standard, in terms of how much of that bundle needs to be given away before it's deemed an assignment for purposes of standing?  Is it --

MR. RADER:  To answer that question, Your Honor, if I might hand up to the Court and its clerks a couple of slides, I've attempted to graphically depict that for the Court.  Since there's so much authority, I thought it'd be helpful to have a graphic depiction.

THE COURT:  Right.  But as you do that, is the -- is the operative term "all substantial rights"?  Or "substantially all substantial rights"?  Or, "many"?

**MR. RADER:**  The operative term, Your Honor, is "all substantial rights."

So, as we explained in the briefing, right, a more traditional assignment of all right, title and interest, would be the entire bundle of sticks.

**THE COURT:**  Yeah.

**MR. RADER:**  And transfer of all substantial rights is something less than the entire bundle.

Now, what the Court is asking about now is the question of as you start transferring away rights one at a time, in your mind, at what point do you cross the threshold where you go from having standing to sue to lacking standing, or in the words of the Federal Circuit, to having transferred away all substantial rights?

Now, I'm not going to go through every one of these slides, I'll just do a couple of them.  And then I have a slide for each of the cases that the parties have briefed, Your Honor, that the Court can certainly go through at its convenience.

On Slide 2, which is the first one, Your Honor, these are the nine factors that in 2010, the *Alfred E. Mann* panel of the Federal Circuit listed, after reviewing a number of cases, these are the nine that they said, "Well, we've looked at these in the past."

I've circled here for you the exclusionary rights that

Your Honor correctly keyed in on as being the key.  Now, why are those the key rights in terms of defining substantial rights?  Those are the key rights because Your Honor, without at least some exclusionary rights, a party lacks constitutional standing to sue.

So, Article III of the Constitution requires that to file any lawsuit, you've got to suffer an injury in fact.  And in the patent context, the Federal Circuit has made clear in the *Morrow* case and other cases that to suffer an injury in fact, a party must possess exclusionary rights.  So a nonexclusive licensee, for example, does not have standing to sue for patent infringement.  Not only can it not sue, alone, it cannot sue even if it joins the patent owner.  That's exclusionary rights.

So there's no question that those three rights are critical.  That is, the exclusive right to make, use, and sell, and then the rights that control disposition of the patent rights, specifically the right to sue, and sell, and grant licenses.

Now, if you turn to the next page, which is the *Vaupel* decision, this is the Federal Circuit's seminal 1991 decision that really kicked off the long line of dozens of Federal Circuit decisions.  And what you can see here is that in *Vaupel,* all three of the exclusionary rights were granted to the transferee, *Vaupel.*

The reason I have colored one of them is pink, that is,

the right to grant licenses, is because that right actually was subject to a veto by the original patent owner, Marowsky.

Nevertheless, despite the fact that it was subject to a veto power by the original patent owner, the Federal Circuit found that all substantial rights have been transferred, and that the veto power was, quote, "a minor derogation from the grant of rights," unquote.

Another critical factor, as you'll see in just a minute, is whether the transfer of rights is permanent.  So one thing that also becomes clear in some of the decisions is if you transfer all substantial rights, but only for a defined period of time, like two years, it's all going to come back to me, that is not considered ultimately a transfer that constitutes an assignment.

In this case, of course, there is no sunset provision, if you will, on the transfer, so that factor is satisfied as well.

What you will see in these slides is that when the decision -- you know, a green circle indicates that the factor is satisfied, favoring a conclusion that all substantial rights have been transferred.  A red circle indicates that a factor is not satisfied, which would detract from a conclusion that all substantial rights have been transferred.

And, a question mark indicates that the Federal Circuit simply didn't address that factor at all.  And actually, the question marks, Your Honor, are instructive, because as you

will see, in many -- the two factors that Copytele primarily relies on, the maintenance fee issue, which is really just an issue of consideration, which party pays the maintenance fees, as well as the right to alienate the agreement, those are often just question marks.  They're not something the Federal Circuit finds significant.

If you move on to the next slide,  which is the *Speedplay* case, you will see very quickly the pattern emerging, Your Honor.  The four circles on the left-hand side of the page are the critical ones.  Those have to be satisfied for the transfer to constitute an assignment.  Everything on the right-hand side of the page, while I wouldn't say it's completely irrelevant, it's of relatively little significance.

So, for example, in *Speedplay*, all five of the factors on the right-hand side of the page either were not present, were not addressed, or were only present in part.

So, for example, to go back to some of the questions you were asking of Counsel, whether the transferee received the right to alienate the agreement, the reason I colored it pink here is because consent was required from the patent owner, in order for the agreement to be alienated.

And that's true in many of these.  There are numerous instances in which that's true, and we've cited several of them in the briefing.  The *Unique* case was one, the *McNeilab* case was another.  Both of those were cases where consent of the

original owner was required to alienate the agreement, and nevertheless, all substantial rights were transferred.  Same thing in *Speedplay*.

In the *McNeilab* and *Unique* cases, Your Honor, just like in this case, there was no tempering of that provision.  In other words, there was no requirement that consent not be unreasonably withheld.  So, they were identical.

**THE COURT:**  Let me ask you, this factor that you acknowledge is of constitutional import, "Transferee receives exclusive right to make, use or sell," what do we do here where there's been some retention of right, at least limited, for noncompetitive use?

Are there cases where it's been split in a similar way, and the court finds that that deserves a green circle, and not a red circle?

**MR. RADER:**  Yes.  Yes, Your Honor.  And those cases are cited in our reply brief, on Pages 7 and 8.  Particularly, on Page 8.

So, the case cases that Copytele relies on, there are two of them.  One of them is the -- I guess there's one.  Copytele relies on the *Abbott* case, *Abbott v. Diamedix*.  And in that case, in that case, the original owner of the patent retained the right to actually compete head to head in the market with the patentee.

And the same thing is true -- there is a second case,

*Fieldturf*.  I cited in it in a footnote.  And, that was identical.  The original patent owner retained the right to compete head to head in the market.  The exact opposite of the language that's at issue in the AUO/Copytele agreement.

And, there are District Court cases that we've cited, two of them, *Adventus* and *PerkinElmer*, both distinguishing *Abbott* specifically on the ground that the rights that were retained in those cases by the original patent owner were noncompetitive or noncommercial in nature, so there was going to be no competition in the marketplace.

So, I think that factor is actually quite clear in the precedent.

**THE COURT:**  All right.  I'll give you the last word on this question.  Thank you.

**MR. RUDOLPH:**  So, again, we -- it's not the case that Copytele was limited from competing with AUO for all EPD products.

The limitation -- the definition of "subject" for EPD products is in Schedule B.  And it's certain technical specification for the types of products that were supposed to be developed under this agreement.  Products that are not consistent with that -- that specification would not be considered, I think, products that would be noncompetitive.

So, I think Copy -- Copytele had the right to use its -- the IP to build products that were not competitive with the

products that were going to be contemplated under the agreement.

THE COURT:  Wait.  So, your interpretation of Schedule B is that Copytele could or could not compete with respect to those?

MR. RUDOLPH:  It could not build competing products that complied with the specifications of Schedule B.

THE COURT:  Yes.

MR. RUDOLPH:  There's one other point, Your Honor, that's important.  That is that regardless of whether or not the agreement's actually effectuated a transfer of the right to sue, Copytele has terminated that agreement, as it's entitled to do under the law.  And therefore, the question is moot.

Whether Copytele may have had the right to sue prior to termination of the agreement is a different question from whether Copytele has the right to sue now.

THE COURT:  Well, you're saying even without an adjudication, that it has the right to terminate the agreement, and all rights then revert?

MR. RUDOLPH:  Copytele does not require a determination that the agreement has been rescinded, which is separate from a determination that the agreement has been terminated.

The Federal Circuit authority addressing rescission and stating that a party requires rescission in order to have

standing to sue are cases where the plaintiff's claims were actually conditioned upon the plaintiff receiving a rescission. And, in fact, in those cases, the plaintiff explicitly pled that their ability to sue for patent infringement was conditioned on the rescission of the agreement.

That's not the case here.  Copytele alleges in the complaint in the antitrust action that it's terminated the agreement pursuant to California law, and therefore, that it has standing.

The requirement that was discussed in *Jim Arnold* is that a plaintiff in a patent case has to have a nonfrivolous claim of standing.  And we think the claim is -- is nonfrivolous here. Copytele has terminated the agreement.

Even, even if, at some point, the Court determines that the agreement needs to be rescinded, Copytele still has standing to sue.

**THE COURT:**  Is there something in the terms of the settlement agreement, itself, that addresses unilateral termination rights by Copytele?

**MR. RUDOLPH:**  There's nothing in the agreement.  But under California law, a party is entitled to terminate a contract for material breach.

**THE COURT:**  But, is it deemed terminated prior to any adjudication or judgment?  I mean, isn't that -- I could see if there was something in here that says, you know, unilateral

right to terminate under certain objective conditions or something, certain condition precedents met.

But if you're saying a general right to terminate a contract can be effective and have legal effect, even prior to any adjudication, that seems like a fairly sweeping proposition.

**MR. RUDOLPH:** Well, the posture is that Copytele has terminated the agreement. AUO and E Ink challenge that. They might prevail on that challenge at some point.

But, whether or not they prevail on that is a separate question from whether E Ink -- or Copytele has standing to sue under the agreement. We think because Copytele has -- has terminated the agreement, it has standing to sue.

**THE COURT:** All right. What's your comment on that?

**MR. RADER:** Yes. I would very much like to respond on that point. If I could direct Your Honor to Page 20 of the slide deck, these are the two operative quotes from the *Jim Arnold* case.

The *Jim Arnold* case made a very clear distinction between licenses and assignments. Assuming Your Honor agrees with us that all substantial rights were transferred to AUO, there's no dispute between the parties that that constitutes an assignment under the related, you know, conclusions of the Federal Circuit, for standing purposes.

What *Jim Arnold* said is that in the case of a license

agreement, okay, if there's an allegation that the license has been terminated, the licensor has standing to sue its licensee, or former licensee, depending on your perspective, and that party, that defendant, can raise the license as an affirmative defense.  And the court will then have to decide whether the license was, in fact, terminated or not.  And if the license was not properly terminated, of course, the licensee will prevail in the action, on its affirmative defense.  But there's no question about standing in the case of a licensor that has not assigned his rights, because it's always had standing to sue.

But, if you look at the right-hand side of the page, and this is addressing the core issue that was before the Court in *Jim Arnold* as well as in the *Heidelberg* case and in the *Nolen* case, the Federal Circuit has repeatedly come to the same conclusion, when it comes to an assignment.  And, I'll explain why it's different.

When the infringement suit involves an assignment rather than a license, unless the assignment may be declared null and void, they've got to go first and get a judicial rescission.

Now, why is it?  Why is that different from a license? The answer is because, Your Honor, after you've assigned your rights, you have been divested of standing.  So you're starting from a position of no standing.  Okay?  And to regain your rights, you have to somehow undo that assignment.

Now, what does the *Jim Arnold* case say are the possibilities?  Says, well, you can have it declared null and void by operation of law, either, one, through a forfeiture provision present in the agreement.  And that, by the way, would be like the *Vaupel* case, which we talked about at the very beginning.  *Vaupel* actually did have a forfeiture provision in the agreement that said if Vaupel ever went bankrupt, Marowsky would get its rights back, the original owner of the patent.  So, one can do that.

But here, as the Court just established with Counsel, and I agree, there is no forfeiture agreement in the AUO agreement.  So, that one is out.

What's the other possibility?  The other possibility is that there's a provision of applicable state law that allows the original owner of the patents to somehow undo its assignment through a termination or cancellation.

Now, here's where the second appellate-level case that the parties have briefed from the Ninth Circuit, the *Welles* case, is absolutely critical.  It's crystal clear, and it answers this question -- it answers this exact question, leaving no doubts.

In the *Welles* case -- and actually it was Copytele that first cited it -- Orson Welles had assigned his rights in the Citizen Kane movie at the time it was made, in an agreement with a studio called ROK Studio (sic), I believe.  And that

agreement, of course, contained a number of other provisions defining what Orson Welles' role was going to be, and what his compensation would be, and so on.

At a later time, Mr. Welles and the studio signed a second agreement, which was referred to as the exit agreement. And the phrase that exit agreement used was that it terminated and canceled -- used both words, just in case there's a difference -- it terminated and cancelled the prior agreement which included the assignment.

Orson Welles' heir -- this is after his death -- brought suit for a declaratory judgment that the exit agreement terminating that original agreement revested the intellectual property rights in Mr. Welles, and therefore his estate, and therefore her.

And the Ninth Circuit rejected that, and held that because the assignment of the intellectual property right is a completed conveyance, it is not an executory portion of a contract that can be terminated. It can be undone in only one way. And this is -- applying the law of California, because the exit agreement was subject to California law, the Ninth Circuit concluded that the only way to undo an assignment of intellectual property rights as opposed to a license is to rescind. And that termination and cancellation, while it -- a termination or a cancellation would end Mr. Welles's further obligations to the movie and to the studio, would end his

compensation, his ongoing compensation and whatever other ongoing aspects there were, it could not undo the completed assignment of the intellectual property rights.

That case is directly on point, and it controls this issue.

THE COURT:  All right.  I'll give you the last word on this.

MR. RUDOLPH:  So, in the *Welles* case, the key factor which is also relevant to -- in the Federal Circuit cases, is that Welles assigned his right in the movies at the moment they were created.  There was no continuing obligation by either party to perform any actions, with respect to that assignment.

Here, taken as a whole, the -- the EPD agreement is an executory contract that, in exchange for a license and sublicensing rights to the patents, AUO was required to act in good faith to jointly develop products.

We think that the EPD agreement allowed Copytele to terminate any assignment of rights, once those executory obligations were breached.

THE COURT:  Well, there's nothing explicit in there. You mean by -- as a matter of contract --

MR. RUDOLPH:  As a matter of contract, under California contract law.

THE COURT:  As a matter of contract law, not as a matter of the express terms of the contract.

MR. RUDOLPH:  That's right.  And the *Jim Arnold* case, it says:

"When the infringers involve..."

(Reporter interruption)

MR. RUDOLPH:  So, the *Jim Arnold* case says that a party needs rescission unless the assignment may be declared null and void by operation of law, either through a forfeiture provision or through a provision of applicable state law.

And we think, under California law, Copytele is entitled to terminate executory contract.

THE COURT:  And you say that's effective, even without any kind of judicial termination, in the absence of any forfeiture provision or something else in the actual contract, itself?

MR. RUDOLPH:  That's correct.

THE COURT:  All right.  I'll take that matter under submission.

Let me turn now to the -- the other case.  The 038 case.

MR. RADER:  Thank Your Honor.

THE COURT:  Thank you.

Why don't you state your name, for the court reporter's benefit, again.

MR. FASTIFF:  Eric Fastiff, on behalf of the Plaintiff.

MR. LAING:  And David Laing on behalf of the

Defendant.

THE COURT: All right. So, there are two routes by which a stay pending arbitration -- that's what I want to address, first of all, logically, the motion for stay pending arbitration. And now that the arbitration, we know, is going forward, the question is whether we stay the action as against this Defendant.

And, there is Section 3 of the Federal Arbitration Act, which provides for a stay when arbitration has been ordered. Normally, that applies to signatories. There is some Fifth Circuit law that suggests it can be applied to non-signatories, where the operative facts are inherently inseparable, where the litigation might have a critical impact on the arbitration, et cetera.

But, I haven't seen any Ninth Circuit law on this question. Has the Ninth Circuit addressed whether Section 3 of the FAA can apply to non-signatories? I didn't see any cites, but I just want to make sure.

MR. RUDOLPH: It hasn't, Your Honor. Only the Fifth Circuit. And, you're correct that the authority from the Fifth Circuit states that -- has suggested that it applies to non-signatories. But there's nothing in the Ninth Circuit that controls this issue.

THE COURT: All right. Well, unless one were to adjudicate on that basis, the second methodology is use of a

discretionary stay under the *Landis* (Phonetic) case, which is a little bit more broad-based. And, that's what I want to talk about.

Here is where it seems to me that the two actions are pretty closely interrelated. I mean, it sort of fits a little bit under the Section 3 analysis, but it also counsels for judicial economy and for a stay, for a very practical reason.

Because if, in the arbitration -- you know, it's one thing if a breach were found, or improper conduct by AU is found, and another thing if it's not found. And that affects, it seems to me, the causes of action against E Ink. Because if there's fraudulent inducement, you know, that may have some impact on the, for instance, aiding and abetting fraudulent inducement claim. If there's -- again, if there's fraudulent inducement, that may have an impact on the antitrust claims.

On the other hand, if there's not -- so, why shouldn't this Court stay until the arbitration adjudicates those I think related claims?

**MR. RUDOLPH:** We agree that obviously, the Court has discretion to stay the case. And, we've -- we think, though, that the -- the key issue is whether E Ink should be allowed to simply sit this one out while AUO and E Ink adjudicate issues that were -- Copytele alleges that E Ink had a fundamental role in the scheme to misappropriate Copytele's technologies.

It would be prejudicial to Copytele to allow E Ink to

simply sit by the sidelines for a year and a half, two years, three years, while this issue is resolved.

THE COURT:  Why would it take three years?  I thought the whole idea of arbitration is to have this adjudicated quicker than a court could.

MR. RUDOLPH:  Sometimes it happens, sometimes it doesn't.  I recently looked at the statistics.  It was -- 500-plus days is the average for the resolution of a complex arbitration.

THE COURT:  Well, you say "sit it out."  On the other hand, if the Court -- thinking through, if the Court were to move forward on these claims, we'd be adjudicating -- we'd have to adjudicate, it seems to me, by necessity, some of the claims and allegations that are involved in the arbitration.

We'd be mooting out the arbitration, which, of course, would be sort of contrary to the overarching policy of the FAA. We would be -- we would be really circumventing that, wouldn't we?

MR. FASTIFF:  Eric Fastiff.  Excuse me for stepping on Mr. Rudolph's toes.

THE COURT:  Sure.

MR. FASTIFF:  But, if I can mention, what's somewhat unique about the posture of these cases is that the arbitration will take place in San Francisco, and this Court, of course, is venued here in San Francisco.  So, it really calls out for easy

and effective judicial case management that could be very efficient.

If we stay the claims against E Ink, and then proceed with the claims against AU, the discovery is going to have to happen twice. In fact, most of the witnesses are either in New York or in Taiwan. That's where E Ink and AUO are headquartered.

So, it seems really essentially unfair to E Ink to force its witnesses, as third-party witnesses to the arbitration with AUO, to be essentially deposed twice. That E Ink will have to be treated as a third-party witness to produce documents.

And, it seems to be very easy to have case management here in San Francisco between the arbitrator and Your Honor, so these cases could proceed in tandem. Discovery would happen once. Everyone would take one trip to Asia. Witnesses would only be deposed once. And, that's the most efficient.

And, Your Honor was talking about the efficiencies of arbitration. Well, this is a prime example of how we can be efficient in a combination of arbitration and a District Court proceeding.

**THE COURT:** So, what you're suggesting is kind of a partial stay. That we allow, for instance, coordinated discovery to go forward, so people won't be deposed twice; if you're going to take a deposition of somebody, all parties should participate, and that could be used in either venue or both venue, if it ends up, you know, moving forward.

**MR. FASTIFF:**  That's right.  I mean, I guess I would seek three strategies.  One would be you would compel E Ink to arbitrate Copytele's claims as well.  It could be part of the arbitration, and resolve it in one forum.

Second --

**THE COURT:**  Do I have the power to do that?

**MR. FASTIFF:**  We probably would have to file a motion.  But I always think district judges have a lot of power, so --

**THE COURT:**  I like to hear that.  Okay.

**MR. FASTIFF:**  Second would be that the arbitration -- the District Court proceeding proceed in tandem.  And the third would be the suggestion that Your Honor just made, which is essentially you stay the legal claims against E Ink, but they participate in discovery as a party.

**THE COURT:**  Okay.  Well, that's the easiest one, that one, it doesn't stretch any -- any known limits on authority.

Is there a problem with that?  Doesn't that make sense?

**MR. LAING:**  Your Honor, as this complaint has been pled, all six claims that Copytele makes against E Ink are predicated upon the same conduct that is going to be resolved in the arbitral tribunal.

All six claims are predicated upon an alleged conspiracy to defraud AUO.  Conspiracy that also violates the antitrust laws, as alleged by Copytele.  All of these claims are going to

be heard and resolved by the arbitral tribunal.

The arbitral tribunal, as a result, will obviate or may well obviate the need for further litigation, to quote from probably the seminal decision from this district on when a stay is appropriate in lieu of arbitration.

And, it will avoid the possibility of any inconsistent results that may occur from this Court, or that may occur from the --

THE COURT:  Well, that's why it makes sense to stay the legal claims, as has been suggested, and not for this Court to try to adjudicate on a parallel track claims that are already being adjudicated or subclaims in the arbitration.

So, but, in terms of, you know, if you're going take a deposition, technically E Ink is not a party to the arbitration, yet they -- they go to Asia to take a deposition, why not have everyone participate, so just in case we come back to this court and try this case, this claim, we don't have to haul people back in the second round of depositions, et cetera, et cetera?  Wouldn't it make some sense?

MR. LAING:  Your Honor, the discovery procedures available through arbitration will arrive at the same information.

THE COURT:  Well, are you willing to -- I mean, is your client willing to say you're not going to seek to take a second deposition of somebody who's been deposed pursuant --

under the rubric of the arbitration proceeding, even if you didn't attend?

**MR. LAING:**  No, Your Honor, but we are saying that the results of the arbitration will control anything that remains to be litigated.  The claims are so substantially related, those claims against E Ink and those claims against AUO, they are inherently inseparable.  And, these are all factual and legal decisions that will be decided in that arbitration.

We are suggesting the Court would be supervising an unnecessary process.

**THE COURT:**  Well, I guess it depends on what we're talking about.  If we're talking about, you know, participating in a limited amount of discovery where -- certainly, I could see in a deposition context, what we don't want is people having to travel around the world once, and then come back.

You're saying in all likelihood you'll not have to take that deposition, because whatever is decided.  But yet, you're not willing to quite commit to say, "Well, I'm not going to take any discovery if somehow it comes back to this court, one way or another."

I mean, if you're willing to make that commitment now, and say you'll be bound by whatever discovery is had and limited to whatever discovery is had in the arbitration, then I -- you know, that's something worth considering.  If you're not

willing to make that concession or agreement, then it seems to me, at least in the area of depositions, that there ought to be some sort of coordination and consolidation.

I haven't thought through all the written discovery, I don't know if -- I mean, of course, some written discovery has to precede depositions, so you may want to participate anyway if you're going to be in on some of the deposition work.

But, I guess my feeling is if you're willing to sort of stipulate that whatever the discovery happens to be within the realm of the pending arbitration will be it, then I would be willing to say let's just stay the whole thing, and the whole -- and really focus on the arbitration.

But if that's not forthcoming, then I'm inclined to direct the parties to see if you can work out some kind of a discovery plan, knowing on the other hand, I don't want to force E Ink to go full-bore and engage in full discovery, knowing that there may or may not be much of a case here.

So, I mean, there's got to be some accommodation of that.

**MR. FASTIFF:** Well, as Counsel said, the claims against E Ink and AUO are, to use his word, "inseparable." I think that the questions are the same, the documents are the same, from Copytele's side. Its witnesses are the same. It doesn't need to -- I really don't think there are any issues that E Ink is going to want to take discovery on of Copytele that AUO isn't going to want to take that same discovery.

Sometimes I'm more concerned about taking depositions and obtaining documents that are located in Asia. The discovery rules are somewhat different. If E Ink is a third party, whether or not subpoenas can be compelled for attendance at deposition, documents to be produced -- certainly, I would hope that any stay here that requires E Ink to participate in discovery as a party, even if the legal claims are stayed, would still allow this Court to exercise jurisdiction over discovery disputes. At least, if they couldn't be resolved by the arbitrable officer. But if a subpoena had to be issued, and compelled attendance, that those issues could be resolved here.

If not, it makes more sense just to keep them as a party, and the case should be -- as I had originally argued, they should proceed in tandem.

**THE COURT:** Well, I'm not going to proceed and do something substantive in this case. I think the most I'm willing to do is to allow for coordinated discovery.

Now, supervision is another problem. I don't -- I think primacy ought to be given to the arbitrator in that regard. But, of course, the arbitrator may not have jurisdiction over certain discovery disputes as between Copytele and E Ink, unless you so stipulate.

I think what makes sense is that now that you know my inclination, I'd like you to sit down and meet and confer, see

if you can work out a coordinated discovery plan that I can adopt.  Or at least, if you can't, let me know what your respective positions are, sort of specifically, and then I can enter an order accordingly.

But my plan at this point is to stay, certainly, any legal analysis, any development of this case in terms of resolving some legal claims, whether that's further motions for summary judgment, or trial.  I'm not -- I'm going to stay that, pending arbitration.

I think the coordinated discovery makes some sense, but I think you all have a better sense of that than I.  And I would like you to meet and confer, and see if you can come up with an agreed-upon plan.  And if not, send me a joint letter telling me what your respective recommendations are in that regard.

MR. FASTIFF:  Absolutely.

MR. LAING:  Your Honor, with that inclination of the Court, it becomes even more important to hear our argument on the motion to dismiss.

THE COURT:  Well, actually, I think it's less important, because we're not going to -- all I'm going to do is allow discovery at this point.

MR. LAING:  Uh-huh.

THE COURT:  And, you know, if I were inclined to start moving this case forward, I would be inclined more to hear a motion to dismiss.  I mean, I have read the papers and

I'm familiar with it.  But, I don't -- I think it's going to be mooted out by the stay at this point.  So, I'd rather you focus on figuring out some way to coordinate discovery, a plan, in that regard.

I also did want to ask you about ADR, since we're here, and we did have a case management conference scheduled.  You say that you have agreed to discuss potential settlement procedures.  Has it come to any fruition?  Have you all agreed on some kind of ADR process?

**MR. FASTIFF:**  We have not agreed to an ADR process.  Sort of looking at Counsel.  I don't want to speak out of turn, at all.  There have been some phone calls back and forth, about seeing whether we could resolve the case.  Some sort of a process.  But, that's been the extent of it.

But as Your Honor noted, in the case management conference statements, the parties said that they'd be willing to entertain an ADR process.  And we certainly think, based on Your Honor's inclination and apparently its order regarding the stay of the E Ink case, that it makes sense at this time to order the parties to proceed either before a Magistrate or a private mediator, or order us to sit down in a room and try to resolve it.  It's the perfect juncture, of course.

**THE COURT:**  It does seem to be.

Do you have any thoughts?

**MS. NGUYEN:**  Well, Your Honor, as Counsel stated,

we've started the discussion. Copytele has provided a proposal. We're in the midst of talking to our client about it.

Frankly, I don't know being forced to go to a Magistrate Judge or go to some sort of ADR will make things go any easier at this point.

**THE COURT:** So, you don't sound favorably inclined introducing a third-party neutral?

**MS. NGUYEN:** I don't know if it's appropriate at this time or not, Your Honor, considering we're just thinking about the proposal. We just got the proposal, I guess, in the last couple of days, frankly.

**THE COURT:** Okay.

**MR. RAWLINSON:** Matt Rawlinson for AUO. I'm not sure what our perceived posture is. We are pursuing ADR in the arbitration.

With respect to whether a court-ordered mediation makes sense now, we've just had a back-and-forth with the Plaintiff, and said that the number that we got was a nonstarter. We would prefer not to do that. We would prefer to go, commence the arbitration.

Obviously, as has been said, district courts have a lot of power, so it's obviously up to you. But we do not think, given the exchange we just had in the last two days, that it would be productive to have discussions now.

**THE COURT:**  I'm always the eternal optimist.  Having mediated many cases that seemed like a nonstarter at the outset, be surprised how many end up resolving.

I take it, though, any settlement discussions would have to be a global -- all parties would have to be involved, I would assume.

**MR. FASTIFF:**  It's an interesting case where there are -- there are patents at issue.  The Plaintiff has a lot of patents that it has invented, that it has possession of, that are outside the scope of just the claims that are in the complaint.  Those are available for sale, for license.

It's a public company.  It needs revenues, like any public company  -- like any company.  It can make deals that are creative.  It can make deals with AUO, it can make a separate deal with E Ink.  There could be a variety of triangular cross-licenses, arrangements.

And I think it's worthwhile for the parties to be in the room for -- hopefully, the principals, at least, to be in the room, and try to discuss what makes sense for all the companies.

**MR. RAWLINSON:**  On that issue, Your Honor, all I'd say is the principals for our two clients are overseas.  And so, it's a significant burden on them.  So it's -- it's not a question of, you know, can we all go outside and have a discussion.  So --

**THE COURT:**  Well, that's not untypical.  I have mediated many cases with people from Korea and Japan and Germany.  And if it's a big case, it's worth -- you know, if it's worth the time for all the lawyers I see in this room, it seems to me -- you know.

And this is not a small case.  I assume you think it's a significant case, as well.

**MR. RAWLINSON:**  We don't, Your Honor.  We don't think we did anything wrong.  We didn't conspire with these guys, blah, blah, blah.

I -- we have just exchanged settlement offers, Your Honor.  It -- in our view, it would be a significant imposition on our clients to suggest that they travel overseas in light of the offer that we just exchanged with the Plaintiffs.

**THE COURT:**  All right.  Well, I hear what you're saying.

On the other hand, I don't think you can judge the probable outcome of any settlement discussions, particularly if they're potential business solutions based on an opening offer or demand.

And so, I am going to refer you to a Magistrate Judge for settlement.  If there's somebody you prefer in particular, if you want to meet and confer about that, consider that.  Otherwise, I'm going to just assign it.

And, to be done -- I think this is something that should

be done sooner rather than later, as we know where we're going on this.  Before, you know, you get too far down the road, I think it's healthy to have that discussion.

MR. FASTIFF:  Our conversations have been very cordial and easy.  I imagine we can speak, if not today, tomorrow.  But we can certainly provide you with a letter by Tuesday, Wednesday of next week, whether or not we can recommend a Magistrate, or have been unable to reach agreement.

THE COURT:  Or if you want to go by private mediation, that's fine, too.

MR. RAWLINSON:  And let me just follow up one time, Your Honor, because this is -- AUO does have legal counsel in the United States.

Can we at least agree that for the initial round, we won't be required to fly folks in from overseas?

THE COURT:  I'm going to leave that to whoever does the mediation, because you will have to make that -- you will have to have that discussion with the Magistrate Judge, if that's where we're going.  Because sometimes it's fine, sometimes it's not.

Often what's critical is actually having decision-makers in the room.  No offense to lawyers, but often things get done when the clients are there, notwithstanding the efforts of the lawyers.  I'm not going to prejudge that.

But I'm not going to, certainly, direct a mediator or

settlement judge to say, "No, under no circumstances can you require the attendance of any particular person."

MR. RAWLINSON:  Okay.  But, as long as we haven't decided it yet.  We can negotiate that, and I think probably get to some reasonable solution.

Given the prior back-and-forth, I wanted to make sure the record was clear, one way or the other.

THE COURT:  I'm not worrying, one way or the other.

MR. RAWLINSON:  Thank Your Honor.

THE COURT:  That will be up to both the parties and the mediator/settlement judge.  And, is it reasonable to say this will be done in the next 90 days?

MR. FASTIFF:  It's certainly reasonable from the Plaintiff, Your Honor.

MS. NGUYEN:  Are you talking about having the session, Your Honor?

THE COURT:  Yeah.

MS. NGUYEN:  I think it, in some part, also depends on whether our clients are going to have to come from overseas.  Right?

MR. RAWLINSON:  Yeah, I -- I think it makes sense, given your direction, Your Honor, for us to talk about it.  I think there are decision-makers in the United States that we can have.  So then it comes, for me, a question of what the process is going to be and how involved it is.  I suspect we

could do it in 90 days on our end.

THE COURT: All right. Well, that's what I'll include in the order at this point. I'm not going to, you know, set any other dates.

The other thing I do want, though, is your discussion and resolution, hopefully, of any discovery -- coordinated discovery plan. Other than that -- and then, why don't we plan another status conference, maybe 120 days out?

THE CLERK: November 7 at 10:30.

MR. RAWLINSON: Your Honor, I have a trial scheduled on November 5. If I could talk with one of my co-counsel, and see if they're available on November 7?

THE COURT: All right.

MR. FASTIFF: We can move it before or after your trial, if it's all right with Your Honor.

THE COURT: How long is your trial?

MR. FASTIFF: Right now I guess about three weeks, if it sticks.

THE COURT: Well, we can move it towards the end of November.

THE CLERK: November 21st at 10:30.

MR. RAWLINSON: That should work for me.

MR. FASTIFF: I think that's fine. What day of the week is that?

THE CLERK: That's the week before Thanksgiving.

**MR. FASTIFF:**  Thank you.  That's fine with us.

**THE COURT:**  All right.  We will see you then, unless you can resolve this case before then.

**MR. FASTIFF:**  Thank you, Your Honor.

**THE COURT:**  And I will receive a letter from you by next Wednesday, I guess you said, on the proposed discovery.

**MR. FASTIFF:**  Yes.  Thank you, Your Honor.

**MR. RUDOLPH:**  Your Honor, there's one housekeeping issue in the patent case.

In the proposed schedule for the parties, we suggested that discovery be teed off starting 28 days following an order on the motion to dismiss, as opposed to 14 days from today, in order to conserve both sides' resources.

**THE COURT:**  Yeah.  Yeah.  That's fine.  I'm going to adopt that, because obviously, it may turn on what I end up doing on this.

**MR. RUDOLPH:**  Thank you, Your Honor.

**THE COURT:**  Okay?  Great, thank you.

(Conclusion of Proceedings)

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Tuesday, July 2, 2013

Belle Ball, CSR 8785, CRR, RDR