UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COPYTELE, INC., | No. C-13-0378 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING** |
| E INK HOLDINGS, INC., *et al.*, | |
| Defendants. | **(Docket No. 38)** |

Plaintiff CopyTele, Inc. has filed a patent infringement action against Defendants E Ink Holdings, Inc. and E Ink Corporation (collectively, "E Ink"). According to CopyTele, it is the sole owner of all rights, title, and interest in three patents (the '935 patent, the '810 patent, and the '488 patent), *see* Compl. ¶¶ 8-10, and E Ink has infringed on those patents. Currently pending before the Court is E Ink's motion to dismiss for lack of standing. In essence, E Ink contends that Copytele's lawsuit is premature because (1) it previously assigned all substantial rights to the patents at issue to a third-party exclusive licensee, AU Optronics Corp. ("AUO"); (2) it has not yet secured a judgment (in a related case, *CopyTele, Inc. v. AU Optronics Corp.*, No. C-13-0380 EMC) that the assignment has been rescinded; and (3) even upon rescission CopyTele will have standing only to sue prospectively and not retroactively.

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** E Ink's motion but without prejudice pending the resolution of CopyTele's case against AUO.

## I.  FACTUAL & PROCEDURAL BACKGROUND

For purposes of the pending motion, the relevant facts are not so much contained within the complaint in *this* case as within the complaint in the related action, *CopyTele, Inc. v. AU Optronics Corp.*, No. C-13-0380 EMC. For convenience, the Court shall hereinafter refer to the related case as the conspiracy case.

In the conspiracy case, CopyTele has filed suit against both E Ink and AUO. The relevant allegations are as follows.

CopyTele is a company with "a 30-year history of inventing, developing, and patenting pioneering display technologies." No. C-13-0380 Compl. ¶ 23. It has patented certain display technologies, including electrophoretic display ("EPD") technologies. *See* No. C-13-0380 Compl. ¶ 2. EPDs "are low voltage, high resolution, black-and-white displays that can be easily viewed in a variety of lighting conditions including bright sunlight." No. C-13-0380 Compl. ¶ 23. They are used, *inter alia*, in eReaders with brand names such as "Kindle" and "Nook." No. C-13-0380 Compl. ¶ 23.

"E Ink is the dominant, worldwide manufacturer and supplier of [EPDs], including those used in eReaders sold under the 'Kindle' and 'Nook' brand names." No. C-13-0380 Compl. ¶ 28. "AUO is one of the world's largest manufacturers of flat panel LCD displays for televisions, computers, and tablets, including the Apple iPads." No. C-13-0380 Compl. ¶ 26.

"In September 2010, AUO approached CopyTele about purchasing a subset of CopyTele's EPD Patents for $1.5 million." No. C-13-0380 Compl. ¶ 29. CopyTele declined and proposed instead that the two companies work together to jointly develop EPD products. Accordingly, in May 2011, the parties entered into a contract, known as the EPD Agreement. *See* Compl., Ex. A (EPD Agreement).

A primary goal of the EPD Agreement "was for CopyTele and AUO to jointly develop EPD Products that would successfully compete with electrophoretic displays manufactured by E Ink." No. C-13-0380 Compl. ¶¶ 4, 12. Key terms in the agreement include the following:

• CopyTele granted to AUO – as well as its subsidiaries – "an exclusive, worldwide license under [the EPD Patents] to make, have made, sell, offer for sale, [etc.] the Licensed Products,

- and also [to] sub-license the Licensed Patents, during the term of the Agreement [*i.e.*, until the last to expire of the Licensed Patents]." No. C-13-0380 Compl., Ex. A (EPD Agreement §§ 2.2, 5.1).
- AUO was given "the right at its discretion to commence, prosecute, compromise and settle any claim, action or proceeding for infringement (past or future), unfair competition, unauthorized use, misappropriation or violation of any of the [EPD Patents] by any unlicensed third party within the territory where the [EPD Patents] may be enforced." No. C-13-0380 Compl., Ex. A (EPD Agreement § 3.1). The contract specified that "[i]t is the intent and agreement of the parties that this Agreement transfers to [AUO] the full exclusive rights and all substantial rights in the Licensed Patents such that Licensee shall be able to bring an Enforcement Proceeding in its own name, and that no rights have been maintained by [CopyTele] that would require [CopyTele] to be a named party to any Enforcement Proceeding." No. C-13-0380 Compl., Ex. A (EPD Agreement § 3.1).
- Each party agreed to an anti-assignment provision as follows. "Except as otherwise specifically provided in [the] Agreement, neither [the] Agreement nor any rights hereunder nor any [EPD Patents] may be assigned or otherwise transferred by any party . . . including by way of sale of assets, merger or consolidation, without the prior written consent of the other party, provided that [AUO] may transfer[] its rights and obligations under this Agreement to a Subsidiary or affiliate without [Copytele's] consent." No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.3).
- The parties "will discuss and conclude a joint development agreement for the Subject EPD Products as soon as practicable after the Effective Date hereof and will make their best efforts to jointly develop the Subject EPD Products." No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.12).

In consideration for the license granted by CopyTele, AUO was to pay "a *de minimis* initial payment, considerable progress payments, and significant running royalties that were tied to the sales of the [jointly developed] EPD Products." No. C-13-0380 Compl. ¶ 31. According to

3

CopyTele, "[w]ithout the joint development commitment from AUO, CopyTele was unwilling to license or sell any of its EPD Patents to AUO." No. C-13-0380 Compl. ¶ 29.

In its complaint, CopyTele maintains that AUO breached its "best efforts" obligations under the EPD Agreement. *See* No. C-13-0380 Compl. ¶¶ 40-46. Moreover, according to CopyTele, AUO never had any intention of using its "best efforts" to jointly develop EPD products. *See* No. C-13-0380 Compl. ¶ 49. "Instead, AUO used the EPD Agreement as an excuse to obtain a license to the EPD Patents, which AUO intended to pass on to E Ink, in conjunction with and in exchange for the $50 million paid by E Ink to AUO in connection with the sale of SiPix [an AUO subsidiary] to E Ink."[1] No. C-13-0380 Compl. ¶ 49. E Ink desired to acquire SiPix not to obtain manufacturing capacity but rather to immunize itself from patent infringement actions (by acquiring SiPix's intellectual property) and avoid price wars. *See* No. C-13-0380 Compl. ¶¶ 58-59. According to CopyTele, "[s]hortly after the announced sale of SiPix to E Ink, and after receiving written notice form CopyTele of CopyTele's intent to terminate the EPD Agreement due to AUO's repeated failures to adhere to its 'best efforts' obligations to jointly develop the EPD Products, with no notice to CopyTele, AUO surreptitiously purported to sublicense CopyTele's patented EPD Technologies to E Ink, again breaching AUO's obligations to CopyTele." No. C-13-0380 Compl. ¶ 7. AUO received no consideration for the sublicense. *See* No. C-13-0380 Compl. ¶ 12. *But see* No. C-13-0380 Compl. ¶ 61 (alleging that AUO and E Ink entered into a cross-licensing agreement).

## II. DISCUSSION

In its motion, E Ink contends that, as a result of the EPD Agreement, CopyTele does not have constitutional standing to prosecute this patent infringement action.

A. Legal Standard

Standing is a matter of subject matter jurisdiction. *See Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (stating that Article III "[s]tanding is a threshold matter central to our subject matter jurisdiction"). A motion to dismiss on the basis of subject matter jurisdiction can be either a facial attack or a factual one. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Here, E

---

[1] CopyTele has alleged that SiPix is a wholly owned subsidiary of AUO. *See* No. C-13-0380 Compl. ¶ 54. AUO and E Ink disputes such, claiming that AUO was a minority owner in SiPix.

4

Ink makes a facial attack. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A court may consider not only the allegations in the complaint in a facial attack but also documents attached to the complaint and judicially noticeable facts. *See Vita-Herb Nutriceuticals, Inc. v. Probiohealth, LLC*, No. SACV 11-1463 DOC (MLGx), 2013 U.S. Dist. LEXIS 40483, at *6 (C.D. Cal. Mar. 20, 2013); *Pacific Coast Fed'n of Fishermen's Ass'ns v. United States DOJ*, No. 1:12-CV-01303-LJO-MJS, 2013 U.S. Dis. LEXIS 32598, at *10 (E.D. Cal. Mar. 8, 2013) (concluding that a facial attack was being made because, "although the parties do reference documents subject to judicial notice and/or attached to the Complaint, Defendant does not offer any additional evidence in support of its jurisdictional arguments"); *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1086-87 (N.D. Cal. 2009) (Henderson, J.) (stating that, in deciding a Rule 12(b)(1) motion, "a court must assume the facts alleged in the complaint to be true unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions").

B. <u>Standing to Sue for Patent Infringement</u>

The Federal Circuit has explained that

> [t]here are three general categories of plaintiffs encountered when analyzing the constitutional standing issue in patent infringement suits: those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit. The first category includes plaintiffs that hold all legal rights to the patent as the patentee or assignee of all patent rights – the entire bundle of sticks. Unquestionably, a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name. Additionally, if a patentee transfers "all substantial rights" to the patent, this amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone. When a party holds all rights or all substantial rights, it alone has standing to sue for infringement.[2]

---

[2] *See also Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (stating that "the question is whether the license agreement transferred sufficient rights to the exclusive licensee to make the licensee the owner of the patents in question[;] [i]f so, the licensee may sue but the licensor may not").

5

> The second category of plaintiffs hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent. As the grantee of exclusionary rights, this plaintiff is injured by any party that makes, uses, sells, offers to sell, or imports the patented invention. Parties that hold the exclusionary rights are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention.
>
> However, these exclusionary rights "must be enforced through or in the name of the owner of the patent," and the patentee who transferred these exclusionary interests is usually joined to satisfy prudential standing concerns. The patentee is joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer. . . .
>
> The third category of plaintiffs includes those that hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the injury in fact requirement. They are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights. Plaintiffs in this category lack constitutional standing. This standing deficiency cannot be cured by adding the patent title owner to the suit.

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339-41 (Fed. Cir. 2007).

In the instant case, E Ink contends that the EPD Agreement between CopyTele and AUO provided for an effective assignment of the patents at issue such that CopyTele lacks the exclusionary rights and all substantial rights to meet the injury-in-fact requirement of constitutional standing. According to E Ink, because the patents were effectively assigned, only AUO has standing to sue, at least until the EPD is rescinded.

To determine whether a provision in an agreement is tantamount to an assignment or is instead merely a license (which would not divest the patentee of standing to sue for infringement), a court "'must ascertain the intention of the parties [to the agreement] and examine the substance of what was granted.'" *Alfred E. Mann Found.*, 604 F.3d at 1359. "It is well settled that 'whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions.'" *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SpA*, 944 F.2d 870, 875 (Fed. Cir. 1991).

1. <u>Intention of the Parties to the Agreement</u>

As noted above, the relevant agreement in the instant case is the EPD Agreement. The EPD Agreement includes a California choice-of-law provision. *See* Compl., Ex. A (EPD Agreement §

6

6.1) (providing that "[t]he rights and obligations of the Parties under this Agreement shall be governed by and construed in accordance with laws of the California"). Thus, the EPD Agreement is to be interpreted under California law. *See id.* at 1359.

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636.

> Such intent is to be inferred, if possible, solely from the written provisions of the contract. The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage," controls judicial interpretation.

*E.M.M.I Inc. v. Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 470 (2004) (citing Cal. Civ. Code §§ 1638-39, 1644). "Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous." *Wolf v. Walt Disney Pics. & Tel.*, 162 Cal. App. 4th 1107, 1126 (2008).

Accordingly, under California law, the Court must determine here whether, on the face of the EPD Agreement, the parties intended there to be an assignment or something tantamount to an assignment, as opposed to a mere license.

The EPD Agreement on its face states:

> It is the intent and agreement of the Parties that this Agreement transfers to [AUO] the full exclusive rights and *all substantial rights* in the Licensed Patents such that Licensee shall be able to bring an Enforcement Proceeding in its own name, and that no rights have been maintained by [CopyTele] that would require [CopyTele] to be a named party to any Enforcement Proceeding.

No. C-13-0380 Compl., Ex. A (EPD Agreement § 3.1) (emphasis added). Given this express statement in the EPD Agreement, it is difficult to see how the parties did *not* intend for there to be an assignment, as CopyTele argues in its opposition. Indeed, the reference to "substantial rights" combined with the statement that CopyTele would not need to be a named party to any enforcement proceeding clearly implicates Federal Circuit law holding that, where all substantial rights have been transferred, then the transferee is effectively the owner of the patent and has the sole right to bring an infringement suit.

In its papers, CopyTele tries to argue that the above statement in the EPD Agreement was simply an expression of intent to convey all rights to sue, and nothing more. *See* Opp'n at 10-12. CopyTele is right in pointing out that it is possible for a patent holder to give another party the right to sue without giving that party all substantial rights. *See* Opp'n at 13; *see also Propat Int'l Corp. v. RPost US, Inc.*, 473 F.3d 1187, 1192 (Fed. Cir. 2007) (stating that a "right to sue" clause in a contract, *unaccompanied by the transfer of other incidents of ownership*, does not constitute an assignment of the patent rights that entitles the transferee to sue in its own name[;] [t]hat principle sensibly reflects that a patent owner may give another responsibility to select targets for suit – a power of attorney, in effect – without surrendering ownership of the patent") (emphasis added). But here, as discussed below, there are other substantial incidents of ownership that have been transferred under the EPD Agreement (*e.g.*, the exclusive license, the right to sublicense, the right to sue and settle for patent infringement).

CopyTele's argument is particularly problematic because it ignores the explicit provision in the EPD Agreement that substantial rights were being transferred to AUO such that CopyTele would not need to be a named party in any enforcement proceeding. *See* Reply at 10 (noting that "an exclusive licensee only gains the ability to sue without joining the patent owner when it receives a transfer of 'all substantial rights'"); *cf. Morrow*, 499 F.3d at 1340 (noting that, where a party holds some exclusionary rights and interests created by the patents statutes, but not all substantial rights to the patent, that party must usually bring suit with the patent holder who transferred the exclusionary rights in order to satisfy prudential standing concerns). Hence, both the explicit terms and the substance of the EPD Agreement evidences the parties' intent to transfer all substantial rights to AUO.

Presented with this situation, CopyTele makes a final contention that, at the very least, the EPD Agreement is ambiguous as to the intent of the parties and, as "there is a disputed issue of fact as to whether the intent of the parties was to simply transfer to AUO a right to sue, . . . the issue cannot be resolved at the pleadings stage." Opp'n at 11-12. The problem with this argument is that the EPD Agreement is not ambiguous on its face. While "a contract apparently unambiguous on its face may still contain a latent ambiguity that can only be exposed by extrinsic evidence," *Wolf*, 162

Cal. App. 4th at 1133, CopyTele has not pointed to any extrinsic evidence that suggests an intent contrary to that expressed in the EPD Agreement. *See WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996) (noting that a "trial court's determination of whether an ambiguity exists is a question of law"; adding that a "trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict").

In sum, the factor of the parties' intent militates in favor of E Ink. It alone, however, is not dispositive.

### 2. Substance of What Was Granted

As noted above, what the parties' intentions are is only part of the Court's inquiry. The Court must also "'examine the substance of what was granted.'" *Mann*, 604 F.3d at 1359.

The Federal Circuit has never "purported to establish a complete list of rights" that must be examined by a court in determining whether a licensee has been given substantial rights in the patent such that it alone has the right to bring suit. *Id.* at 1360. The Federal Circuit, however, has

> listed at least some of the rights that should be examined. Of course, transfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment. We have also examined the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent. *Frequently, though, the nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor, is the most important consideration.* Where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee. It does not, however, preclude such a finding if the licensor's right to sue is rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses to the accused infringers. Under the prior decisions of this court, *the nature and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent.*

*Id.* at 1360-61 ( emphasis added).

In the instant case, E Ink contends that AUO was assigned all substantial rights because, under the agreement (1) AUO was given an exclusive license and for the lifetime of the patents at issue; (2) AUO was given the right to sublicense without any restraints; (3) AUO was given the unfettered right to sue and settle at its discretion; and (4) there was no specific provision providing for a reversion of rights to CopyTele under any circumstances, including a breach by AUO. *See* Mot. at 8. At the hearing, CopyTele did not really dispute that these rights were substantial rights, including the right to settle and sue which, as noted above, the Federal Circuit has considered to be the most important consideration.

Nevertheless, CopyTele argues that it still has standing to sue because AUO was not assigned *all* substantial rights – *i.e.*, under the agreement, CopyTele retained significant rights, in particular: (1) CopyTele had the responsibility to pay maintenance fees for the patents at issue, *see* No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.11) (providing that "[CopyTele] agrees to make any maintenance fees for the Licensed Patents in a timely manner as they are due"); (2) CopyTele "retain[ed] a non-exclusive right to use the Licensed Patents and Licensed Products in a non-competitive manner," No. C-13-0380 Compl., Ex. A (EPD Agreement § 2.2); and (3) AUO was barred from assigning or transferring the agreement, any rights under the agreement, or the licensed patents without the prior written consent of CopyTele. *See* No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.3).

### a. Obligation to Pay Maintenance Fees

Section 6.11 of the EPD Agreement provides as follows:

> [CopyTele] agrees to make any maintenance fees for the Licensed Patents in a timely manner as they are due. [CopyTele] agrees to take further reasonable actions as may be requested by [AUO] from time to time during the term of this Agreement to effectuate the terms and conditions of this Agreement.

No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.11).

As a preliminary matter, the Court notes that the section taken as a whole indicates that CopyTele's payment of maintenance fees is not really for its own benefit but rather is part of the obligations owed to AUO. *See* Reply at 9. Thus, arguably, for that reason alone, the above provision should not constitute a retention of substantial rights by CopyTele. However, even to the

extent CopyTele's payment of maintenance fees is some evidence of retained ownership of the patents at issue, the Federal Circuit has never held that the payment of such fees is dispositive. At best, evidence of such is simply one indication of ownership. *See Propat*, 473 F.3d at 1191 (stating that "[t]he responsibility to maintain a patent is one of the obligations that has been recognized by this court as an *indication* that the party with that obligation has retained an ownership interest in the patent") (emphasis added); *see also Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001) (concluding that Sonique retained significant ownership rights in the patent at issue but not based solely on its obligation to pay the maintenance fees for the patent; noting, *e.g.*, that Sonique could develop and manufacture products for sale to licensee, supervise and control licensee's product development, and "most importantly" had the first obligation to sue parties for infringement). It is not a conclusive factor.

###### b. Right to Use Patents

Section 2.2 of the EPD Agreement provides as follows:

> [CopyTele] hereby grants to [AUO] and its Subsidiaries an exclusive, worldwide license under any and all Licensed Patents to make, have made, sell, offer for sale, use, import, export, lease and/or otherwise dispose of the Licensed Products, and also sub-license the Licensed Patents, during the term of the Agreement. *[CopyTele] retains a non-exclusive right to use the Licensed Patents and Licensed Products in a non-competitive manner, consistent with this Agreement.*

No. C-13-0380 Compl., Ex. A (EPD Agreement § 2.2) (emphasis added).

According to CopyTele, the above retention of rights establishes that it retained substantial rights to the patents at issue, as established by multiple Federal Circuit cases. However, the cases on which CopyTele relies are all distinguishable. In none of the cases was there a significantly *restricted* right to use the patent – certainly nothing comparable to a restriction to use the patent in a noncompetitive manner as provided for above. Indeed, in two of the cases, the Federal Circuit took note of a retained right to market and sell the patented invention – something that the EPD Agreement would bar CopyTele from doing if it would be competitive to AUO.

- *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372 (Fed. Cir. 2000). In *Prima Tek*, there was not even a fact pattern involving a patent holder's retention of a right to use the patent. CopyTele seems to rely on the case primarily because it contains the following statement:

11

"In evaluating whether a particular license agreement transfers all substantial rights in a patent to the licensee, we pay particular attention to whether the agreement conveys *in full* the right to exclude others from making, using and selling the patented invention in the exclusive territory." *Id.* at 1379 (emphasis in original). But the Federal Circuit never held that a failure to convey in full was dispositive, particularly in the situation where there is a *restricted* right to use the patent by the patent holder.

- *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995). In *Abbott*, the Federal Circuit held that the defendant retained substantial rights in part because it "retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patent, as well as the right to sell products to end users, to parties with whom Diamedix had pre-existing contracts, and to pre-existing licensees." *Id.* at 1132. As noted above, in the instant case, the EPD Agreement does not provide that CopyTele retained the right to use the patents by selling products embodying the patented inventions to others in a competitive manner. CopyTele's right to use the patent is substantially restricted to noncompetitive use. *See* No. C-13-0380 Compl., Ex. A (EPD Agreement, Schedule B) (defining "Subject EPD Products"). Moreover, in *Abbott*, there were other considerations that the court took into account in concluding that the defendant retained substantial rights. *See id.* (noting that "Diamedix retained a limited right to make, use, and sell products embodying the patented inventions, a right to bring suit on the patents if Abbott declined to do so, and the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business").

- *Fieldturf, Inc. v. Southwest Rec. Indus., Inc.*, 357 F.3d 1266 (Fed. Cir. 2004). In *Fieldturf*, the agreement simply stated that a company would be an exclusive licensee; the agreement did not address who would have the right to enforce the patent at issue against infringers or whether the patent holders retained the right to develop, display, commercialize, and market embodiments of the patent. *See id.* at 1269. The Federal Circuit stated that "[t]hese omissions were significant." *Id.* "[W]ithout granting [the company] the right to enforce the patent, either explicitly or impliedly, the document conveys no more than a bare license." *Id.*

While a "licensor's retention of a limited right to develop and market the patented invention indicates that the licensee failed to acquire all substantial rights," the agreement was "silent with respect to [this] important consideration[]" as well. *Id.* (citing *Abbott*). Here, the right to enforce the patent is clearly vested in AUO.

Notably, a number of courts have held that a retention of noncompetitive rights does *not* amount to a retention of substantial rights. *See, e.g.*, *Adventus Am. Inc. v. Innovative Envtl. Techs.*, No. 06 CV 3267, 2007 U.S. Dist. LEXIS 15611, at *12-13 (N.D. Ill. Mar. 5, 2007) (noting that "the University has retained non-commercial research investigatory rights" but stating that "[t]hese research rights . . . are not the same type of 'use' rights the Federal Circuit has held amount to a failure to transfer all substantial rights to a licensee") (citing *Abbott*); *PerkinElmer Health Scis., Inc. v. Agilent Techs., Inc.*, No. 12-10562-NMG, 2013 U.S. Dist. LEXIS 3288, at *9-10 (D. Mass. Jan. 8, 2013) (stating that "the License Agreement appears to convey most, if not all, substantial rights to PerkinElmer, who obtained all commercial use rights and the right to sublicense the patents for commercial purposes, for the duration of the patents"; Yale simply retained the right to make, use, and practice the patented material for noncommercial purposes); *see also Trendx Enters. v. All-Luminum Prods.*, 856 F. Supp. 2d 661, 669 (D.N.J. 2012) (distinguishing case because "the patent owner retained the rights only for a limited educational, non-commercial purpose").

      c.     <u>Right to Assign</u>

Section 6.3 of the EPD Agreement states as follows:

> Except as otherwise specifically provided in this Agreement, neither this Agreement nor any rights hereunder nor any Licensed Patents may b assigned or otherwise transferred by any party, in whole or in part, whether voluntary or by operation of law, including by way of sale of assets, merger or consolidation, without the prior written consent of the other party, provided that [AUO] may transfer[] its rights and obligations under this Agreement to a Subsidiary or affiliate without [CopyTele's] consent. Any purported assignment without any such consent is void.

No. C-13-0380 Compl., Ex. A (EPD Agreement § 6.3).

///

///

///

1    CopyTele argues that the above provision, which limits the right of AUO to assign its rights
2 under the agreement to a third party (*i.e.*, consent of CopyTele is required), is dispositive – *i.e.*, it
3 establishes that CopyTele retained substantial rights.

4    CopyTele relies in large part on *Propat*, where the Federal Circuit noted that "[t]he right to
5 dispose of an asset is an important incident of ownership." *Propat*, 473 F.3d at 1191. But *Propat* is
6 distinguishable on its facts. As in the instant case, in *Propat*, the agreement between the patent
7 holder and the licensee provided that the licensee could not assign its rights under the agreement
8 without the consent of the patent holder. However, the agreement in *Propat* used very specific
9 language – *i.e.*, that the patent holder could "freely withhold" consent. *Id.* at 1190. The district
10 court considered this provision to mean that the patent holder could withhold consent "'even
11 arbitrarily,'" *id.*, and the Federal Circuit seemed to agree. *See id.* at 1191 (referring to "the
12 unrestricted power to bar Propat from transferring its interest in the patent to a third party"; also
13 stating that "the agreement expressly indicates that Authentix is free to veto any such transfer
14 decision, even if it does so 'arbitrarily'"). It was this ability to *arbitrarily* refuse consent to which
15 the Federal Circuit gave great weight:

> Authentix's right to veto any transfer of Propat's rights under the agreement is particularly significant, the more so because the agreement expressly indicates that Authentix is free to veto any such transfer decision, even if it does so "arbitrarily." The right to dispose of an asset is an important incident of ownership, and such a restriction on that right is a strong indicator that the agreement does not grant Propat all substantial rights under the patent.

20 *Id.*

21    Here, Section 6.3 does not confer upon CopyTele the right to withhold consent arbitrarily.
22 Absent such a provision, the right to withhold consent is subject to the implied covenant of good
23 faith and fair dealing. *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988) (stating that
24 "'[e]very contract imposes upon each party a duty of good faith and fair dealing in its peformance
25 and its enforcement'").

26    CopyTele's reliance on *Sicom Systems Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971 (Fed.
27 Cir. 2005), presents a closer case. In *Sicom*, the Federal Circuit seemed to express agreement with
28 the lower court's statement that the restriction on the licensee's right to assign/sublicense (*i.e.*,

14

consent of the patent holder was required) was a "'fatal reservation of rights.'" *Id.* at 979. Nevertheless, it is far from clear that the Federal Circuit rested its decision on that specific fact alone. Indeed, in *Sicom*, there were a number of factors pointing to a retention of substantial rights by the patent holder – *e.g.*, the licensee did not have the exclusive right to sue for any kind of infringement, the licensee did not have the right to settle litigation without the consent of the patent holder, the patent holder reserved the rights to grant contracts and subcontracts to develop, and so forth. *See id.* As noted above, many substantial rights were transferred to AUO, including the right to sue and settle and the right to sublicense.

With respect to the right to sublicense, *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006), and *Vaupel*, 944 F.2d at 870, are particularly instructive cases. In *Aspex*, the licensee was given "a virtually unfettered right to sublicense all of its rights to a third party [of its own choosing]." *Aspex*, 434 F.3d at 1138. While there was another provision in the license agreement that no right under the agreement could be assigned or transferred by the licensee without the patent holder's prior written consent (unless the assignment was made to an affiliate of the licensee), *see id.* at 1341, the licensee contended that this provision was not "meaningful" because the "more relevant provision" was the former. The Federal Circuit agreed stating that, "given its *virtually unfettered right* to sublicense, Chic's limited ability to assign its rights to unaffiliated third parties is not controlling." *Id.* at 1342 (emphasis added).

As E Ink argues, *Aspex* is essentially analogous to the instant case. Here, even though the EPD Agreement has a provision that requires the other party's consent to an assignment (§ 6.3), that provision has an exception – *i.e.*, "[e]xcept as otherwise specifically provided in this Agreement," Compl., Ex. A (EPD Agreement § 6.3) – and the EPD Agreement includes another provision (§ 2.2) which expressly gives AUO the right to "sub-license the Licensed Patents." Compl., Ex. A (EPD Agreement § 2.2). That right to sublicense does not appear to be subject to any restrictions.

*Vaupel* also weighs against CopyTele. In *Vaupel*, the Federal Circuit noted that the license agreements showed that the patent holder retained, *inter alia*, a veto right on sublicensing by the licensee. In spite of this veto right (or consent requirement), the court stated that the right was not "so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all

15

substantial rights." *Vaupel*, 944 F.2d at 875. The court characterized "[t]he sublicensing veto [as] a minor derogation from the grant of rights" that "did not substantially interfere with the full use by [the licensee] of the exclusive rights under the patent." *Id.* Here, of course, there is not even a sublicensing veto. However, even if the Court were to evaluate the *assignment* veto (*i.e.*, the requirement that CopyTele consent to the assignment), *Vaupel* indicates that that veto right constitutes at best a "minor derogation" from the broad grant of rights under the EPD Agreement. *Id.* The power to withhold consent appears to be restricted by the duty of good faith, as noted above.

To be sure, in *Refax International, Ltd. v. Visa USA, Inc.*, No. C-89-2198-DLJ (ENE), 1990 U.S. Dist. LEXIS 11942 (N.D. Cal. June 26, 1990), Judge Jensen noted that "REFAC is . . . precluded under the agreement from assigning its rights under the patent to anyone except a successor company that acquires REFAC's entire business. In the opinion of the Court, we need look no farther in determining that the patentee Lemelson reserved substantial rights under the agreement." *Id.* at *14. But the restriction on transfer here is not so broad. In any event, *Refax* predated *Aspex* and *Vaupel*.

### 3. Summary

Because both the intention of the parties and the substance of what was granted under the EPD Agreement indicate that the EPD Agreement between CopyTele and AUO was tantamount to an assignment of the patent, and not merely a license, *see Mann*, 604 F.3d at 1359, or merely an assignment of the bare right to sue, the Court holds that all substantial rights were transferred to AUO such that it alone has the right to bring a suit for patent infringement. *See Morrow*, 499 F.3d at 1340 (noting that, if a patentee transfers 'all substantial rights' to the patent, this amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone"). CopyTele does not have standing to prosecute the action.

## C. Termination

CopyTele argues that, even if, as an *initial* matter only AUO had standing to bring a suit for patent infringement because of the assignment of substantial rights under the EPD Agreement, CopyTele obtained standing to sue once AUO materially breached the EPD Agreement. According to CopyTele, once AUO materially breached the agreement, that legally gave CopyTele the right to

1    terminate the agreement[3] – which it did prior to filing suit – thus all rights essentially reverted back
2    to CopyTele and gives it standing to bring the patent infringement suit. *See* Opp'n at 16-17.

3        In response, E Ink argues that CopyTele did not have the right to terminate the agreement
4    because it had assigned (and not licensed) rights to AUO. That is, E Ink contends that, where rights
5    have been *assigned*, the only way to undo an agreement is to rescind it; in contrast, where rights
6    have been *licensed*, then an agreement may be undone by terminating it. *See* Reply at 11-13 (citing,
7    *inter alia*, *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567 (Fed. Cir. 1997)). While the
8    Court has found that the EPD Agreement effected in essence an assignment and not a mere license
9    of the patent to AUO, the Court need not resolve the issue of whether a rescission or termination of
10   the agreement is required to vest CopyTele with enforcement rights, because there is a more
11   fundamental problem.

12       CopyTele does not dispute that whether there was a material breach by AUO is a question of
13   fact that needs to be resolved before the issue of patent infringement can be addressed. *See* Opp'n at
14   17. Indeed, CopyTele's reliance on *CAI International Inc. v. South Atl. Container Lines, Ltd.*, No. C
15   11-2403 CW, 2012 U.S. Dist. LEXIS 93214, at *16 (N.D. Cal. July 5, 2012), underscores that there
16   must be an adjudication of the breach issue first. Given this circumstance, this infringement suit by
17   CopyTele is premature. *See Heidelberg Harris, Inc. v. Loebach*, 145 F.3d 1454, 1458 (Fed. Cir.
18   1998) (noting that, in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), the
19   court had held that "a plaintiff cannot sue for patent infringement occurring prior to the time that
20   plaintiff actually obtained legal title to the asserted patent")[4]; *cf. Whitmore v. Arkansas*, 495 U.S.
21   149, 158 (1990) (noting that "[a]llegations of possible future injury [*i.e.*, contingent future injury] do
22   not satisfy the requirements of Art. III"); *see also Texas v. United States*, 523 U.S. 296, 300 (1998)
23   (stating that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may
24   not occur as anticipated, or indeed may not occur at all") (internal quotation marks omitted).

---

[3] The EPD Agreement does not contain an express termination clause.

[4] To the extent CopyTele tries to distinguish *Arachnid* because, unlike the plaintiff in *Arachnid*, CopyTele is the legal title holder of the patents at issue, *see* Opp'n at 19-20, it misses the point that, even though it may be the legal title holder, it transferred all substantial rights to AUO such that AUO alone has the right to bring suit.

CopyTele fails to address this problem in its papers. Moreover, its suggestion that it can regain the right to enforce the patent simply by a *unilateral* declaration that the EPD Agreement is terminated is without any support. In fact, to allow CopyTele to prosecute the instant case after this Court has found that the right to enforce the patent was assigned to AUO would contravene the rule that the party which holds all substantial rights "*alone* has standing to sue for infringement." *Morrow*, 499 F.3d at 1340 (emphasis added).

D.  Joinder of AUO

Finally, CopyTele makes the assertion that whether the EPD Agreement transferred all substantial rights to AUO and whether the EPD Agreement has been terminated or rescinded are ultimately "academic" issues because "joining AUO as a party to the instant case pursuant to Federal Rule of Civil Procedure 19 will obviate any standing issue." Opp'n at 20.

The problem with this argument is that CopyTele must first have standing before it can ask for another party to be joined. As determined above, CopyTele does not, at this juncture, have standing to bring a claim for patent infringement. *See WiAV Solns. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010) (stating that "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury").

Notably, the cases cited by CopyTele in its opposition brief are largely distinguishable because they address a patent infringement action being brought by an exclusive licensee who has standing since it had certain exclusionary rights. Here, CopyTele does not claim to be an exclusive licensee. The party to whom all substantial rights, including the right to enforce, have been assigned is AUO, and thus it alone has standing to sue. *See Alfred E. Mann*, 604 F.3d at 1360 .

### III.  CONCLUSION

For the foregoing reasons, the Court concludes that CopyTele has failed to establish standing at this juncture to proceed with its patent infringement suit. The EPD Agreement transferred all substantial rights to AUO such that AUO alone has standing to bring a suit for infringement – at least until a determination is made that AUO materially breached the agreement such that the agreement may be terminated or rescinded.

Accordingly, the Court grants E Ink's motion to dismiss but the dismissal shall be without prejudice to the extent that this ruling does not bar CopyTele from asserting a patent infringement claim against E Ink should a judicial determination be made that AUO materially breached the EPD Agreement, thus resulting in termination or rescission.

The Clerk of the Court is instructed to enter a final judgment in accordance with this opinion and close the file in the case.

This order disposes of Docket No. 38.

IT IS SO ORDERED.

Dated: July 9, 2013

_____
EDWARD M. CHEN
United States District Judge